## SECURITIES AND EXCHANGE COMMISSION v. SUNBEAM GOLD MINES CO. et al.

### No. 8637.

Circuit Court of Appeals, Ninth Circuit.

March 21, 1938.

Allen E. Throop, Gen. Counsel, and Thomas J. Lynch and Chester T. Lane, Assts. Gen. Counsel, all of Washington, D.C., and Day Karr, and James E. Newton, both of Seattle, Wash. (Francis Thornton Greene, of Washington, D. C., and Samuel H. Levy, of counsel), for appellant.

Frank Hale, of Tacoma, Wash., for appellees.

Before DENMAN, MATHEWS, and HEALY, Circuit Judges.

DENMAN, Circuit Judge.

This is an appeal by the Securities and Exchange Commission from an or-

der denying a temporary injunction. The Commission brought a suit in equity against the defendant corporation seeking to enjoin it from an intended issue of securities without disclosing their character and registering them with the Commission pursuant to section 6 et seq., of the Securities Act of 1933, as amended, 15 U.S.C.A. § 77f et seq.

The facts are as alleged in the complaint and affidavits filed. They are not in dispute. The defendant Sunbeam Gold Mines Company is a Nevada corporation with stockholders in various states of the Union. Sometime prior to April, 1937, it entered into an agreement with another company, the Golden West Consolidated Mines, to purchase all the assets of the latter, subject to the approval of the stockholders of both companies.

This deal was subsequently approved by the stockholders of both companies. They gave their powers of attorney for the consolidation of the two companies, but this had not been accomplished when the bill was filed.

While the agreement was pending this approval, and on April 26, 1937, the defendant company issued through the mails a number of letters, 530 to be exact. Of the 530 recipients, 115 were stockholders of the defendant Sunbeam Company; 207 were stockholders of the Golden West Mines, and 208 were stockholders of both companies. These 530 people were scattered through various states.

The letters solicited pledge loan agreements from the stockholders for the purposes of completing the purchase by Sunbeam Company of the assets of the Golden West Mines and of raising enough money to register a contemplated new issue of stock with the Securities and Exchange Commission.

Upon signing the pledge loan agreement, the stockholder was to receive a "shareholder's receipt"—in effect a promissory note of Sunbeam Company—promising to repay the sum loaned with interest. The complaint alleges that the defendant proposes to send through the mails these shareholders' loan receipts to the 530 mixed stockholders of Sunbeam Company and Golden West Mines; that such a shareholders' loan receipt is a security within the meaning of the Securities Act, and hence is subject to registration with the Commission. The Commission brought this suit under section 20(a) of the act, 15 U.S.C.A. § 77t(a), authorizing injunctions against issuance of securities in violation of the act.

The court below, in denying an interlocutory injunction, held that the shareholders' loan receipt was a security within the meaning of the act, and that its distribution through the mails over state lines would make it subject to the required registration proceedings unless it came within the following exception stated in section 4(1) of the act, 15 U.S.C.A. § 77d(1), that the provisions of section 5, as amended, 15 U.S.C.A. § 77e, making unlawful the distribution of securities without registration:

"Shall not apply to any of the following transactions: * ' * *

"Transactions by an issuer not involving any public offering."

The court denied the injunction on the sole ground of its interpretation of this exception as meaning that such a distribution to stockholders did not involve a public offering. The language of its conclusion of law is: "The transactions by the defendants herein being solely with stockholders of Sunbeam Gold Mines Company and Golden West Consolidated Mines, all of said stockholders being stockholders of respondent company through merger of said corporations do not, irrespective of the number of said stockholders, involve a public offering within the meaning of section 4(1) of the Securities Act of 1933, as amended, and the plaintiff's application for preliminary injunction is therefore denied."

At the hearing here both parties agreed that the correctness of the conclusion of law last stated is the sole question involved in the appeal. They also agree that it is the sole question involved in the case itself, and that its decision will dispose of the entire litigation. Since the findings of fact are unquestioned and agreed to be a full statement of the case, and since they show no ground for the exercise of discretion, no presumption arises that the court otherwise properly exercised it in denying the injunction. We are therefore warranted in considering and disposing of the appellant's challenge of the lower court's conclusion of law. Cumberland Telephone & Telegraph Co. v. City of Memphis et al., 6 Cir., 200 F. 657, 658; Winchester Repeating Arms Co. v. Olmsted, 7 Cir., 203 F. 493, 494; National Picture Theatres, Inc. v. Foundation Film

Corp., 2 Cir., 266 F. 208, 210; Wheeling & L. E. R. Co. v. Pittsburgh & W. V. R. Co., 6 Cir., 33 F.2d 390, 393, certiorari denied 280 U.S. 593, 50 S.Ct. 40, 74 L.Ed. 640. See, also, Hanover Star Mill Co. v. Allen & Wheeler Co., 7 Cir., 208 F. 513, 523, L.R.A.1916D, 136, and City of Covington, Ky. v. Cincinnati, N. & C. R. Co., 6 Cir., 71 F.2d 117, 119, certiorari denied 293 U.S. 612, 55 S.Ct. 142, 79 L.Ed. 702.

The purpose of the Securities Act is stated in its title to be: "To provide full and fair disclosure of the character of securities sold in interstate and foreign commerce and through the mails, and to prevent frauds in the sale thereof and for other purposes." 48 Stat. 74.

Sections 6, 7 and 8, 15 U.S.C.A. §§ 77f to 77h, contain the provisions for the "disclosure" of information as to the security to be offered which shall be available to those to whom the offer is to be made. Section 4(1) makes an exception of those "transactions by an issuer not involving any public offering." Being an exception from the general policy of the act, anyone claiming to be within its terms has the burden of proof that he belongs to the excepted class—that is, that his offer is not to the public. Schlemmer v. Buffalo R. & P. R. Co., 205 U.S. 1, 27 S.Ct. 407, 51 L.Ed. 681, and cases there cited.

Furthermore, the terms of such an exception to the "general policy" of the act must be "strictly construed" against the claimant of its benefit. Spokane & Inland R. Co. v. U. S., 241 U.S. 344, 350, 36 S.Ct. 668, 60 L.Ed. 1037.

The question here is, What was the Congress' intent when it required that the detailed information concerning the security should be made available to everyone considering its purchase, and then excepted transactions by an issuer not involving any "public" offering?

Appellees contend that the phrase "public offering" has but a single clear meaning, and that is in effect equivalent to an offer to everyone. Hence, it is claimed, a restriction of an offer to a particular group of persons, such as here the 323 stockholders of the offering company and the 207 stockholders of the company sought to be merged with the offerer, must be a private rather than a public offering.

We cannot accept this contention. On the contrary, we agree with the view of the appellant that the word public "is one familiar to everyone, but of the most varied and indefinite connotations. In its broadest meaning the term 'public' distinguishes the populace at large from groups of individual members of the public segregated because of some common interest or characteristic. Yet such a distinction is inadequate for practical purposes; manifestly, an offering of securities to all red-headed men, to all residents of Chicago or San Francisco, to all existing stockholders of the General Motors Corporation or the American Telephone & Telegraph Company, is no less 'public', in every realistic sense of the word, than an unrestricted offering to the world at large. Such an offering, though not open to everyone who may choose to apply, is none the less 'public' in character, for the means used to select the particular individuals to whom the offering is to be made bear no sensible relation to the purposes for which the selection is made. For the purposes of an offering of securities, red-headed men, residents of San Francisco, and stockholders of General Motors are as much members of the public as their antithetical counterparts. To determine the distinction between 'public' and 'private' in any particular context, it is essential to examine the circumstances under which the distinction is sought to be established and to consider the purposes sought to be achieved by such distinction."

Since the phrase "public offering" does not ex vi termini determine its interpretation with reference to its exceptive purpose, it is proper to consider the reports of the committees of the two Houses of Congress and of the Conference Committees of both in the progress of the original bill through its amendments to its enactment. U. S. v. Great Northern R. Co., 287 U.S. 144, 154, 53 S.Ct. 28, 31, 77 L.Ed. 223.

The bill as originally passed by the House, following the recommendation of the Committee on Interstate and Foreign Commerce, exempted from registration requirements the issuance of additional capital stock of the issuer among its own stockholders exclusively, where no commission or other remuneration was paid or given in connection with the sale or distribution, H.R. 5480, 73d Cong., 1st Sess., Sec. 4(3). This original House draft also exempted "transactions by an issuer not with or through an underwriter and not involving any public offering. * * * *"

Section 4(1). In reporting to the House, the Commerce Committee said of this exemption: "Paragraph (1) broadly draws the line between distribution of securities and trading in securities, indicating that the act is, in the main, concerned with the problem of distribution as distinguished from trading. It therefore exempts all transactions except by an issuer, underwriter, or dealer. Again, it exempts transactions by an issuer unless made by or through an underwriter so as to permit an issuer to make a *specific or isolated sale of its securities to a particular person,* but insisting that if a sale of the issuer's securities should be made generally to the public that that transaction shall come within the purview of the act." (Italics supplied.) H.R.Rep. No. 85, 73d Cong., 1st Sess. p. 15.

Thus on the first draft of the measure it is clear that neither the Committee nor the House considered the test of "public offering" to be the inclusion or noninclusion of nonstockholders of the issuer in the group to whom the security was to be issued.

When the Senate received the measure, it eliminated the exemption contained in section 4(3), supra (including an exemption of stock dividends). The bill then went to conference, where the Senate's elimination of this exemption was approved by the Managers on the Part of the House, who stated, H.R.Rep. No. 152, 73d Cong., 1st Sess. p. 25: "The House provision (Section 4(3) exempting stock dividends and the sale of stock to stockholders is omitted from the substitute since stock dividends are exempt without express provision as they do not constitute a sale, not being given for value. *Sales of stock to stockholders become subject to the act unless the stockholders are so small in number that the sale to them does not constitute a public offering."* (Italics supplied.)

Again, in 1934, when the Securities Act was amended, 15 U.S.C.A. § 77b et seq. and notes, a proposal to exempt from registration securities offered by an issuer to its employees was rejected by the Committee of Conference of the two Houses. In this connection, the Managers on the Part of the House stated: "The conferees eliminated the third proposed amendment to this subsection on the ground that the participants in employees' stock-investment plans may be in as great need of the protection afforded by availability of information concerning the issuer for which they work as are most other members of the public." H.R.Rep. No. 1838, 73d Cong., 2d Sess., p. 41.

These Reports clearly demonstrate that the Congress did not intend the term "public offering" to mean an offering to any and all members of the public who cared to avail themselves of the offer, and that an offering to stockholders, other than a very small number, was a public offering.

Cases are cited by the appellees in which are given interpretations of the word "public" in regulatory statutes. None is shown to have the legislative history of the Securities Act and none applies the rule of strict construction of the instant exception to the general policy of the legislation required by the Supreme Court.

We therefore hold that an offering of securities under the Securities Act of 1933 may be a public offering though confined to stockholders of an offering company, a fortiori where the offerees include the stockholders of another company, though seeking to become stockholders of the offeror.

Since the burden of proof is on the company claiming the benefit of the exception, and since it admits that it has no further facts to submit concerning the offeree stockholders than that they are stockholders, we are not required to determine whether such an offer becomes private rather than public if each of the 530 stockholders were shown to know everything about the mining properties, their operation, and the financial condition of the company, which would be disclosed if the management had complied with the Securities Act and furnished the information to the Commission.

The order denying the injunction is reversed, and the cause remanded for the further action of the District Court in view of the admission here that the companies rest the final decision of the case on the ruling on the order denying the temporary injunction.

Reversed.