SECURITIES & EXCHANGE COMMIS-
SION v. RALSTON PURINA CO.
No. 14611.

United States Court of Appeals
Eighth Circuit.

Nov. 21, 1952.

Writ of Certiorari Granted March 9, 1953.

See 73 S.Ct. 643.

David Ferber, Special Counsel, Securities
and Exchange Commission, Washington,
D. C. (Roger S. Foster, Gen. Counsel, Rob-

ert L. Randall, Atty., Securities and Exchange Commission, Washington, D. C., Alexander J. Brown, Jr., and Robert J. Sugrue, Attys., and Thomas B. Hart, Regional Adm'r, Securities and Exchange Commission, Chicago, Ill., were with him on the brief), for appellant.

Thomas S. McPheeters, St. Louis, Mo. (George W. Simpkins and Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., were with him on the brief) for appellee.

Before SANBORN, WOODROUGH, and COLLET, Circuit Judges.

SANBORN, Circuit Judge.

The Securities and Exchange Commission has appealed from a judgment dismissing an action brought by it in October, 1951, under Section 22(a) of the Securities Act of 1933, 48 Stat. 86, 15 U.S.C.A. § 77v (a), against the Ralston Purina Company, to enjoin it from using the mails or the instruments of interstate commerce in selling or offering to sell its common stock.

In its complaint the Commission alleged that the Company was engaged and was about to engage in acts or practices violative of Section 5(a) of the Act, 48 Stat. 77, 15 U.S.C.A. § 77e(a) ;[1] that since the fall of 1947 the Company has been selling its common stock, and in the sale of the stock has been using the mails and instruments of interstate commerce, and that no registration statement with respect to the stock has been in effect with the Commission.

The Company denied that it was engaging or was about to engage in acts and practices violative of Section 5(a) of the Act. It denied that it had sold or offered for sale its common stock except in limited quantities to carefully selected key employees pursuant to a long-established custom of the Company to encourage such employees to become owners of stock. The Company stated that it was of the opinion that what it had done in making its unregistered common stock available to key employees did not constitute a public offering and was not violative of Section 5(a) of the Act; but that no sales of its stock offered in 1951 had been consummated pending a determination of its right to sell such unregistered stock to the key employees who had applied for it. The Company admitted using the mails or instruments of interstate commerce in offering its key employees an opportunity to purchase common stock.

The sole issue at the trial of the case in the District Court, and the sole question here, is whether the Company can follow its policy of making available each year for purchase a limited amount of its common stock to a select group of employees regarded as key employees, without registering the stock with the Commission.

The question turns upon the interpretation and scope of Section 4(1) of the Act as amended, 48 Stat. 77, 48 Stat. 906, 15 U.S.C.A. § 77d(1), which exempts from the provisions of Section 5(a) "transactions by an issuer not involving any public offering". The District Court concluded that what the Company had done in selling and offering to sell common stock to key employees involved a private and not a public offering of stock, and that, by virtue of Section 4(1) of the Act, the Company was not required to register its common stock with the Commission, D.C., 102 F.Supp. 964. This conclusion the Commission asserts is clearly wrong.

Since Congress has furnished no precise standards for determining what constitutes a "public offering" of a security, it seems apparent that every case in which the question as to whether an offering is public or private arises will have to be decided largely upon the precise facts and cir-

---

1. "*Prohibitions relating to interstate commerce and the mails*

 "Sec. 5. (a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

 "(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell or offer to buy such security through the use or medium of any prospectus or otherwise; or

 "(2) to carry, or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale."

cumstances surrounding the offering. The evidence in the instant case is virtually undisputed, although the Commission questions the validity of certain inferences drawn by the District Court. It must be remembered, however, that the Company as the prevailing party is entitled to the benefit of all inferences which reasonably can be drawn in its favor. Cleo Syrup Corporation v. Coca-Cola Co., 8 Cir., 139 F.2d 416, 418, 150 A.L.R. 1056; Skelly Oil Co. v. Holloway, 8 Cir., 171 F.2d 670, 674.

The factual situation with which we are confronted is briefly as follows:

The Company was organized in 1894. It manufactures feeds and cereals. It has grown until in 1951 it was operating 36 feed mills, 6 soy bean processing plants, 3 cereal mills, many warehouses and elevators, and 7,000 retail outlets. It has about 7,000 employees. The net sales of the Company's products in the fiscal year ending September 30, 1951, were in excess of $340,000,000. Its branches are scattered throughout the United States. It does a nation-wide ·business. The most rapid growth of the Company has taken place since 1940.

The Company has had continuity of management. Its founder is still active in its management. Most of its officers have spent their entire business lives in its employ. Its policy has been to· promote its personnel from within the organization.

From the inception of the Company it has encouraged stock ownership by employees, particularly by key employees, and has from time to time made stock available to such employees. It sold stock to employees as early as 1911. About 80% of the Company's common stock is owned or controlled by employees, members of employees' families, or former employees, about 1,000 to 1,500 employees being stockholders. The Company has never sold any of its common stock to the public nor for the purpose of raising money. Sales of stock by the Company to employees have been limited exclusively to key employees.

In 1942 the Company sold 1,269 shares of common stock to 59 key employees, and in 1943 it sold 2,000 shares to 109 such employees. Thereafter for several years it sold none of its stock to key employees because most of them were stockholders; but, with the expansion of its business, it again offered them stock in 1947. In that year, as of October 1, the Company sold 6,984 shares to 243 key employees (of whom 187 were already stockholders) at $47.50 a share. In 1948, as of September 30, the Company sold 1,120 shares to 20 key employees (of whom 18 were already stockholders) at $50 a share. In 1949, as of October 3, it sold 10,000 shares to 414 key employees (of whom 267 already owned stock) at $55 a share. In 1950, as of September 22, the Company sold 9,659 shares to 411 key employees (300 of whom already were stockholders) at $70 a share. In September, 1951, the Company made 10,000 shares available for purchase by key employees at $80 a share. Of these employees, 167 applied for 3,769 shares of stock. Of the 167, 139 were stockholders. No stock has been sold to the applicants, due to this litigation.

The Company's definition of a key employee is as follows:

"A key employee of course can be an officer or a department head or an assistant to a department head but is not confined to an organization chart. It would include an individual who is eligible for promotion, an individual who especially influences others or who advises others, a person whom the employees look to in some special way, an individual, of course, who carries some special responsibility, who is sympathetic to management and who is ambitious and who the management feels is likely to be promoted to a greater responsibility."

Key employees are selected by the "top management" of the Company, after consulting with the men who manage the mills and have supervision over and direct contact with a substantial number of employees.

The reasons of the management for selling stock to key employees were stated to be as follows:

"We feel, sir, that that creates a greater efficiency with the company, because it draws employees of the com-

pany closer together. Many of our people come from the rural area, where proprietorship is a matter of great pride to them. The fact that they feel that they are owners, at least part owners, in the company, contributes to the morale, and we feel that the idea of breaking down the gap between the ownership and management is something that is highly desirable and something that contributed substantially to the success of the company."

Notification that stock was available to key employees came to them through the managers under whom they worked. The managers were told not to solicit orders for stock, but "simply to acquaint the people who had indicated an interest or whom they felt it was fair to notify of the situation."

During the past several years the Company has on September 30, the end of its fiscal year, paid bonuses to key employees. These have been substantially the same persons to whom stock was sold during these years. Many of them have wanted to invest their bonus money in the common stock of the Company. The common stock is an unlisted stock and there is only a limited over-the-counter market for it. Any substantial amount of competitive bidding might raise the market price artificially. That is one of the reasons why the Company attempted to make common stock available to the employees to whom bonuses were paid.

Since 1945 the Company has published a regular annual financial statement, which has been sent to all of its stockholders, furnished to banks and brokers more or less generally, and filed with the Securities and Exchange Commission, with which the Company's preferred stock was registered in 1945. Bi-monthly sales and production records are sent out to all the key people of the Company, and are available to any employee. The selection of key personnel to whom bonuses are paid and to whom stock is made available is not dependent upon payroll classification or the importance of the positions held. Stock has been purchased by those holding positions as trainees, clerks, and stenographers, as well

as by those who are executives and managers. Those who have purchased stock from the Company have done so for purposes of investment. Resales of stock purchased by key employees have been negligible,—317 shares in 1947, none in 1948, 89 in 1949, and 45 in 1950. Of those employees who sold their stock, most had left the Company's employ.

The Company's estimate of the number of key employees to whom common stock was offered in 1951 was about 500. Since the evidence showed that stock was made available to substantially the same persons who received bonuses, and since in 1951 $1,575,000 was paid out in bonuses to 674 employees, it seems probable that the estimate of the Company was low. However, approximately 75% of the key employees to whom bonuses were paid, and to whom stock was offered, during the years 1947 to 1950, inclusive, were already stockholders of the Company. Presumably, they were advised of its financial condition through its annual reports. The other 25% might reasonably be believed to have some knowledge of the Company's progress from sales and production records. More than 80% of the employees who applied for stock in 1951 were already stockholders of the Company.

Lewis Stuart, a Vice-President, Secretary, and a Director of the Company, who testified in its behalf, said, in response to the question as to why the Company did not register the stock offered to employees in 1951:

"The reasons are very definite. Personally, I have been through a registration just once, and when we started to register our preferred stock, we started in January. It took until May 15th before we could get the schedules. It cost us tens of thousands of dollars. Now, when you are putting out an issue, or when you are selling to a group, to a small intimate group, if the sale is between three or four or ten thousand shares and you have to spend for a hundred special accountants' fees, lawyers' fees, printing expenses, travel expenses, clerical expenses—there is a host of expenses in connection with the

registration which makes it entirely unwarranted to spend that much money to accommodate key employees. The big factor is a very important factor. We come to the end of the year; we cannot wait 3½ months to know what we are going to do; we have to deal with our employees, pay our bonuses, and make our deals then. If we have to wait for 3½ months, or if we have to wait for 2½ months, which probably would be a pretty fair length of time, and then pay financial extras, legal people, accounting people, printing, long distance telephone and telephone calls, clerical expenses, travel, and pile all that expense on the sale of a few shares of stock to an intimate group, we feel that that is entirely unwarranted, and it is a matter of economy on our part * * *."

■ The Company had the burden of proving that its offering of stock to its key employees came within the exemption provided by Section 4(1) of the Act, which, being an exception to the general policy of the Act, is to be strictly construed and may not receive such a broad construction as would be destructive of the plain purpose which caused the Act to be adopted. Spokane & Inland Empire Railroad Co. v. United States, 241 U.S. 344, 350, 36 S.Ct. 668, 60 L.Ed. 1037; Securities and Exchange Commission v. Sunbeam Gold Mines Co., 9 Cir., 95 F.2d 699, 701. The purpose of the Act is to prevent, so far as possible, frauds in the sale of securities by requiring that investors be furnished with adequate information relative to securities offered to them. In Securities and Exchange Commission v. Chinese Consolidated Benevolent Association, Inc., 2 Cir., 120 F.2d 738, 740, the court said: "But the aim of the Securities Act is to have information available for investors. This objective will be defeated if buying orders can be solicited which result in uninformed and improvident purchases." The rule requiring the strict construction of statutory language does not require that the words of an enactment be given their narrowest meaning or that the law makers' evident intent be disregarded. United States v. Corbett, 215 U.S. 233, 242–243, 30 S.Ct. 81, 54 L.Ed. 173; United States v. Giles, 300 U.S. 41, 48, 57 S.Ct. 340, 81 L.Ed. 493.

■ In determining whether the Act requires that securities be registered, the honesty of the issuer, the soundness of the securities offered, or the delay and expense which may be involved in securing their registration, are not of material consequence.

The problem presented by this case is somewhat reminiscent of that considered by the Supreme Court in Welch v. Helvering, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212, in which the Court was required to determine whether certain expenditures made by a taxpayer were "ordinary and necessary expenses". In that case, Mr. Justice Cardozo said, pages 114–115 of 290 U.S., page 9 of 54 S.Ct.: "Here, indeed, as so often in other branches of the law, the decisive distinctions are those of degree and not of kind. One struggles in vain for any verbal formula that will supply a ready touchstone. The standard set up by the statute is not a rule of law; it is rather a way of life. Life in all its fullness must supply the answer to the riddle."

It would, of course, be unreasonable to suppose that Congress, in exempting from the provisions of Section 5(a) of the Act "transactions by an issuer not involving any public offering", intended that an offering not open to everyone was exempt. It would be equally unreasonable to rule that the language of Section 4(1) of the Act did not mean what it purported to mean or that no offering was exempt which the Commission might regard as a public offering.

The Commission is of the opinion that the exemption provided by Section 4(1), when read in the light of its legislative history, of the construction placed upon it by the Circuit Court of Appeals of the Ninth Circuit in Securities and Exchange Commission v. Sunbeam Gold Mines Co., 9 Cir., 95 F.2d 699, and of the Commission's own administrative interpretation of the section, does not exempt offerings such as those in suit.

The legislative history upon which the Commission relies is that referred to by the Circuit Court of Appeals of the Ninth Cir-

cuit in the Sunbeam Gold Mines Co. case, supra, in which it was held that an offering of securities by that company to its 323 stockholders and to 207 stockholders of another company to raise money to effect a merger of the two companies was a public offering and was therefore not exempt from registration. In that case the court said on pages 701–702 of 95 F.2d:

"The bill as originally passed by the House, following the recommendation of the Committee on Interstate and Foreign Commerce, exempted from registration requirements the issuance of additional capital stock of the issuer among its own stockholders exclusively, where no commission or other remuneration was paid or given in connection with the sale or distribution, H.R. 5480, 73d Cong., 1st Sess., Sec. 4 (3). This original House draft also exempted 'transactions by an issuer not with or through an underwriter and not involving any public offering. * * *' Section 4(1). In reporting to the House, the Commerce Committee said of this exemption: 'Paragraph (1) broadly draws the line between distribution of securities and trading in securities, indicating that the act is, in the main, concerned with the problem of distribution as distinguished from trading. It therefore exempts all transactions except by an issuer, underwriter, or dealer. Again, it exempts transactions by an issuer unless made by or through an underwriter so as to permit an issuer to make a *specific or isolated sale of its securities to a particular person,* but insisting that if a sale of the issuer's securities should be made generally to the public that that transaction shall come within the purview of the act.' (Italics supplied.) H.R.Rep. No. 85, 73d Cong., 1st Sess. p. 15.

"Thus on the first draft of the measure it is clear that neither the Committee nor the House considered the test of 'public offering' to be the inclusion or noninclusion of nonstockholders of the issuer in the group to whom the security was to be issued.

"When the Senate received the measure, it eliminated the exemption contained in section 4(3), supra (including an exemption of stock dividends). The bill then went to conference, where the Senate's elimination of this exemption was approved by the Managers on the Part of the House, who stated, H.R. Rep. No. 152, 73d Cong., 1st Sess. p. 25: 'The House provision (Section 4(3)) exempting stock dividends and the sale of stock to stockholders is omitted from the substitute since stock dividends are exempt without express provision as they do not constitute a sale, not being given for value. *Sales of stock to stockholders become subject to the act unless the stockholders are so small in number that the sale to them does not constitute a public offering.*' (Italics supplied.)

"Again, in 1934, when the Securities Act was amended, 15 U.S.C.A. § 77b et. seq. and notes, a proposal to exempt from registration securities offered by an issuer to its employees was rejected by the Committee of Conference of the two Houses. In this connection, the Managers on the Part of the House stated: 'The conferees eliminated the third proposed amendment to this subsection on the ground that the participants in employees' stock-investment plans may be in as great need of the protection afforded by availability of information concerning the issuer for which they work as are most other members of the public.' H.R.Rep. No. 1838, 73d Cong., 2d Sess., p. 41.

"These Reports clearly demonstrate that the Congress did not intend the term 'public offering' to mean an offering to any and all members of the public who cared to avail themselves of the offer, and that an offering to stockholders, other than a very small number, was a public offering."

The District Court, in the instant case, in considering the legislative history of Section 4(1) of the Act quoted the colloquy between Senator Fletcher, a member of the Committee of Conference which considered the proposed amendment offered in 1934 to

exempt the sale of stock by an issuer to its employees, and Senator Hastings who had submitted the amendment, see page 967 of 102 F.Supp. Senator Fletcher, in substance, advised the Senate that the proposed amendment was rejected because a majority of the members of the conference committee were of the opinion that Section 4 (1) of the Act already exempted an offer of stock by an employer to its employees.

 If Congress had intended that the exemption provided by Section 4(1) of the Act was to apply only to specific or isolated sales or offerings of securities by an issuer to a particular person or to a numerically small group, it is reasonable to believe that it would have said so, and would not have left the scope of the exemption to inferences to be drawn from committee reports or the rejection of a proposed amendment offered at a subsequent session of Congress. The Supreme Court has said: "Whatever was said in the debates on the bill or in the reports concerning it, preceding its enactment or during its enactment, must give way to its language, or, rather, all the reasons that induced its enactment and all of its purposes must be supposed to be satisfied and expressed by its words, * * *." Mackenzie v. Hare, 239 U.S. 299, 308, 36 S.Ct. 106, 107, 60 L.Ed. 297. See, also, Warner v. Dworsky, 8 Cir., 194 F.2d 277, 279, certiorari denied 343 U.S. 965, 72 S.Ct. 1060; Missouri Pac. R. Co. 5¼% Secured Serial Bondholders' Committee v. Thompson, 8 Cir., 194 F.2d 799, 803–804. It is

fair to assume that the words used by Congress in expressing its intent more nearly reflect that intent than would any other words which were readily available. Assuming, however, that recourse properly may be had to the legislative history of Section 4(1) of the Act, we agree with the District Court that there is nothing in that history which demonstrates that the offerings in suit do not fall within the exemption provided by that Section.

We do not regard the decision of the District Court in the instant case as inconsistent with the opinion of the Ninth Circuit in the Sunbeam Gold Mines Co. case, the correctness of which as applied to the facts of that case we do not doubt. There are obvious distinctions between an offering of securities to all of the stockholders of two companies, parties to a proposed merger, to raise funds to effectuate the merger, and an offering, without solicitation, of common stock to a selected group of key employees of the issuer, most of whom are already stockholders when the offering is made, with the sole purpose of enabling them to secure a proprietary interest in the company or to increase the interest already held by them.

The administrative interpretation of Section 4(1) of the Act, referred to by the Commission, is reflected by an opinion of John J. Burns, its General Counsel, in 1934, which is found in 11 Fed.Reg. (1946), § 231.285, page 10,952, and which, for convenience, we have set out in the margin.[2]

---

2. "The opinion has been previously expressed by this office that an offering of securities to an insubstantial number of persons is a transaction by the issuer not involving any public offering, and hence an exempted transaction under the provisions of Section 4(1) of the Securities Act. Furthermore, the opinion has been expressed that under ordinary circumstances an offering to not more than approximately twenty-five persons is not an offering to a substantial number and presumably does not involve a public offering.

"As a result of such opinions there appears to be developing a general practice on the part of issuers desiring to avoid registration of their securities to seek to dispose of the same to insurance companies or other institutions, which, at

the time of purchase, state that they are acquiring such securities for investment and not with a view to distribution.

"I would call your attention to the fact that in previous opinions it has been expressly recognized that the determination of what constitutes a public offering is essentially a question of fact, in which all surrounding circumstances are of moment. In no sense is the question to be determined exclusively by the number of prospective offerees. I conceive that the following factors in particular should be considered in determining whether a public offering is involved in a given transaction:

"1. *The number of offerees and their relationship to each other and to the issuer.* You will note that this does not mean the number of actual purchasers,

This opinion discusses the factors to be considered in attempting to determine whether an offering is public or private. These factors are stated to be: (1) the

but the number of persons to whom the security in question is offered for sale. The word 'offering' in this sense should not be limited to those cases wherein a formal proposal for a firm commitment is submitted. Any attempt to dispose of a security should be regarded as an offer. I have very serious doubt as to whether in many of those cases where it is stated that an offering is to be made only to an insubstantial number of persons, there may not be preliminary conversations for the purpose of ascertaining which of various possible purchasers would be willing to accept an offer of the security in question if it were made to them. Any such preliminary negotiations or conversations with a substantial number of prospective purchasers would, in my opinion, cause the offering in question to be a public offering, thereby necessitating prior registration of the security in question.

"Again, in determining what constitutes a substantial number of offerees the basis on which the offerees are selected is of the greatest importance. Thus, an offering to a given number of persons chosen from the general public on the ground that they are possible purchasers may be a public offering even though an offering to a larger number of persons who are all the members of a particular class, membership in which may be determined by the application of some preexisting standard, would be a nonpublic offering. However, I have no doubt but that an offering restricted to a particular group or class may nevertheless be a public offering if it is open to a sufficient number of persons.

"I also regard as significant the relationship between the issuer and the offerees. Thus, an offering to the members of a class who should have special knowledge of the issuer is less likely to be a public offering than is an offering to the members of a class of the same size who do not have this advantage. This factor would be particularly important in offerings to employees, where a class of high executive officers would have a special relationship to the issuer which subordinate employees would not enjoy.

"2. *The number of units offered.* If the denominations of the units are such that only an insubstantial number of units is offered, presumably no public offering would be involved. But where many units are offered in small denominations, or are convertible into small denominations, there is some indication that the issuer

recognizes the possibility, if not the probability, of a distribution of the security to the public generally. The purpose of the exemption of nonpublic offerings would appear to have been to make registration unnecessary in these relatively few cases where an issuer desires to consummate a transaction or a few transactions and where the transaction or transactions are of such a nature that the securities in question are not likely to come into the hands of the general public.

"In connection with a consideration of the number of units offered, I would also consider whether the same or other securities of the same issuer are being offered at the same time. I feel that this circumstance has a bearing on the character of the offering.

"3. *The size of the offering.* It should be noted that the exemption of Section 4(1) is of transactions by an issuer *not involving* any public offering. In view of this language, it would appear to be proper to consider not merely the specific transaction or transactions between the issuer and the initial purchasers, but also the extent to which a later public offering of all or part of the securities sold by the issuer is likely. Hence I feel that this exemption was intended to be applied chiefly to small offerings, which in their nature are less likely to be publicly offered even if redistributed.

"For the same reason I feel that a material consideration is whether the security in question is part of an issue already dealt in by the public, either on a national securities exchange or on the over-the-counter market, or, within the reasonable contemplation of the parties, is likely thus to be dealt in shortly after its issuance. This factor again may indicate whether public distribution of the security in question is likely within a reasonable time.

"4. *The manner of offering.* I have already indicated my opinion that the purpose of the exemption of nonpublic offerings is largely limited to those cases wherein the issuer desires to consummate a few transactions with particular persons. Consequently, I feel that transactions which are effected by direct negotiations by the issuer are much more likely to be nonpublic than those effected through the use of the machinery of public distribution.

"I have gone into this matter at length in order that you may be apprised of the many elements which in my opinion go in-

number of offerees and their relationship to each other and to the issuer; (2) the number of units offered; (3) the size of the offering; and (4) the manner of offering.

It is evident that the Commission considers that the offerings in the instant case were made to too many employees and involved too many shares of stock to be non-public offerings, and that if Section 4(1) of the Act is construed to exempt such offerings the remedial purposes of the Act may be impaired. We sympathize with the efforts of the Commission to restrict the exemption granted by Section 4(1) to the narrowest possible scope, but we do not think that the intra-organizational offerings of stock by the Company, unaccompanied by any solicitation, which have resulted in a limited distribution of stock, for investment purposes, to a select group of employees considered by the management to be worthy of retention and probable future promotion, is to be excluded from the exemption of nonpublic offerings granted by Congress. There is, we think, virtually no possibility that these offerings, if continued, will frustrate or impair the purpose of the Act.

The judgment of a trial court will not be reversed by this Court unless it can demonstrate, at least to its own satisfaction, that the judgment is wrong. That we are unable to do in this case. Our opinion is strictly confined to the precise facts here involved, and is not to be taken as a ruling that employees' stock investment plans are generally within the exemption granted by Section 4(1). If the offerings with which we are concerned were made to all employees or to employees selected at random or by lot or without any logical basis for the selection, a different question would be presented.

The judgment appealed from is affirmed.

to the determination of what constitutes a transaction not involving any public offering. There may be some situations where all the factors are so clear that it would be possible to express a definite opinion. In a situation such as you present, however, I feel that the offering would be carefully scrutinized by any court before which it may come and that any letter which purported to describe the situation, and on which my opinion would necessarily be based, could not adequately advise as to the various factors which are involved.

"I call your attention to the fact that any dealer who might subsequently purchase from an initial purchaser the securities which you propose to offer, would be required to satisfy himself that the initial purchaser had not purchased with a view to distribution. If the initial purchaser had purchased with this intent, he would be an underwriter, and sales by a dealer of securities bought by him from such an initial purchaser would, as a general rule, not be exempt until at least a year after the purchase of the securities by the dealer. The sale of unregistered securities to a limited number of initial purchasers, therefore, leads to a practical situation in which such initial purchasers may have difficulty in disposing of the securities purchased by them. Any opinion which I might render in connection with the proposed offering might, I fear, be availed of by the issuer or by an initial purchaser as a means of satisfying a dealer, at a later date, that he might purchase the securities in question and market them without risk of violating the Act. You will appreciate that my opinion would not actually have this effect, since in the case of each transaction there would be involved various matters of fact on which I am not in a position to express an opinion.

"Accordingly, it seems a much wiser policy for me not to express an opinion in the situation which you present as to whether a public offering is involved."