609 F.2d 960
 Fed. Sec. L. Rep. P 97,212
SECURITIES AND EXCHANGE COMMISSION, Plaintiff-Appellant,
v.
BLAZON CORPORATION; Arthur E. Lloyd; Gary B. Larson; Utah
Capital Corporation; Glenn W. McMurray,
Defendants-Appellees.
SECURITIES AND EXCHANGE COMMISSION, Plaintiff-Appellee,
v.
BLAZON CORPORATION et al., Defendants,
Utah Capital Corporation and Glenn W. McMurray, Defendants-Appellants.
 Nos. 77-1904, 77-2033.
 United States Court of Appeals,
Ninth Circuit.
 Dec. 14, 1979.
 
 Richard Harris, and Hancock, Rothert & Bunshoft, San Francisco, Cal., Thomas M. Burton, San Francisco, Cal., for defendants.
 David Ferber, Securities & Exchange Comm., Washington, D. C., for plaintiff.
 Appeal from the United States District Court for the Northern District of California.
 Before DUNIWAY and KENNEDY, Circuit Judges, and KING,* District Judge.
 DUNIWAY, Circuit Judge:
 
 
 1
 These are appeals by the plaintiff Securities and Exchange Commission and by the defendants Utah Capital Corporation (Utah) and Glenn W. McMurray from portions of the judgment entered on cross motions for summary judgment.
 
 
 2
 The Commission's complaint is in two counts. Count I charges violations of the antifraud provisions of the Securities Act of 1933 (§ 17(a)), 15 U.S.C. § 77q(a), and the Securities Exchange Act (§ 10(b)), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated under it, 17 C.F.R. 240.10b-5, in the offer and sale of stock of Blazon Corporation. The district court granted summary judgment in favor of the Commission on Count I, and issued a permanent injunction. Count II charges violations of the registration provisions of the Securities Act (§ 5(a) and (c)), 15 U.S.C. § 77e(a) and (c). The district court denied an injunction on this count, granting summary judgment for Utah and McMurray, dismissing Count II.
 
 
 3
 In our No. 77-1904, the Commission appeals from the dismissal of Count II and from a provision of the injunction for review and possible dissolution at the request of Utah and McMurray after 18 months. In our No. 77-2033, Utah and McMurray cross-appeal from the summary judgment for the Commission and the injunction on Count I. They also assign as error interlocutory orders denying their motions to dismiss the action and for summary judgment and granting a motion of the Commission to strike certain affirmative defenses interposed by them. We affirm in both appeals.
 
 
 4
 I. The Facts.
 
 
 5
 Blazon Corporation was incorporated in Arizona on September 19, 1972, to engage in "the business of purchasing, developing and subdividing land and the construction and sale of residential homes thereon." It was conceived of and formed by McMurray and one Arthur G. Lloyd. McMurray was the president, general manager and a director of Utah, which was in the business of providing capital to new small businesses.
 
 
 6
 After initial success in Idaho, McMurray wanted to make investments in land in Arizona, through Utah. In Arizona, he met Lloyd, who later found an 80-acre parcel of land (Mesa-80) and four other investors each willing to invest $5,000 in Blazon to be used to purchase Mesa-80. Utah agreed to match the total investors' equity of $25,000.
 
 
 7
 On June 2, 1972, one Lloyd Webb, one of the investors, purchased Mesa-80 for $240,000. To provide the $100,000 downpayment on the purchase, Webb sold 16 acres of Mesa-80 to Blazon for $48,000 and 23 adjacent acres of Mesa-80 to Lloyd for $50,000, financed by a $50,000 loan from Utah to Lloyd. On February 9, 1973, Lloyd acquired Webb's remaining interest in Mesa-80 by assuming Webb's mortgage and borrowing $83,250 from Utah to meet the payment schedule.
 
 
 8
 In purchasing 16 acres of Mesa-80 Blazon spent nearly all of its cash. To obtain the capital necessary to establish its business, Blazon undertook to raise money by a public offering under the "small issues" exemption provided in Section 3(b) of the Securities Act, 15 U.S.C. § 77c(b) and Regulation A, 17 C.F.R. 203.251 Et seq. (Reg. A).[1] This was the method of attracting outside equity used in Utah's successful venture in Idaho. The stock offering circular and the notification form required by the Commission were prepared by Blazon vice-president and legal counsel, Gary Larson. On February 8, 1973, as required by Reg. A, Blazon filed with the Commission's San Francisco office documents covering the sale of 400,000 shares of Blazon common stock at $1.00 per share.
 
 
 9
 According to the offering circular, Blazon intended to engage in the business of purchasing, subdividing and developing land and arranging for the construction and sale of residential homes. The offering circular described the 16-acre plot of land which Blazon had purchased to begin its real estate development. It further stated that Blazon intended to purchase from Lloyd another 23 acres adjacent to the 16-acre plot for $80,000 $3,500 per acre which was stated to be Lloyd's cost of acquiring the property. This $80,000 was to come from the proceeds of the public offering. In addition, Blazon informed investors that it had allocated $230,000 of the offering proceeds to the development and construction of homes on its 16-acre plot.
 
 
 10
 The stock offering officially began on June 18, 1973. Larson was responsible for periodic progress reports to the Commission on stock sales. These were filed, and on March 25, 1974, he filed a Form 2-A letter with the Commission reporting the conclusion of Blazon's public offering.
 
 
 11
 Between the February 8, 1973, filing and the March 25, 1974, conclusion of the public offering, the nature of Blazon's business and the financial relationships between Blazon and its management and major stockholder dramatically changed.
 
 
 12
 The changes were these: On September 11, 1973, before any Blazon stock had been sold to the public, Blazon bought the lease of a trailer manufacturing factory, Western Leisure, Inc., assuming outstanding obligations on a deed of trust as partial payment for the lease, and creating $210,143 of long term indebtedness. To finance this transaction, Blazon borrowed $50,000 from AMR, Inc., the Idaho portfolio company of Utah, which had previously been negotiating to purchase Western Leisure. Later, Blazon borrowed $50,000 from Utah to repay AMR, Inc. In order to purchase Western Leisure, Blazon borrowed an additional $450,000 from Utah, giving Utah the right to receive 336,500 shares of Blazon common stock at its election, in lieu of repayment.
 
 
 13
 In January, 1974, Lloyd and Larson arranged for Blazon to pledge a $10,000 time certificate of deposit as collateral for a loan to Sunset Producers, Inc., an Arizona corporation, of which Larson was an incorporator. The loan was for the purpose of promoting a concert. Sunset defaulted on the loan, and the bank foreclosed on Blazon's pledged certificate of deposit.
 
 
 14
 In March, 1974, Blazon, AMR, Inc., and another corporation formed a joint venture to purchase the Flying H Farm, a 6,000 acre Idaho wheat farm being sold at a distress sale. AMR, Inc. had an option to purchase it. As part of this transaction, Blazon lent AMR, Inc. $225,000 out of the proceeds of Blazon's stock offering.
 
 
 15
 Just before the close of the Blazon stock offering, Lloyd and Larson arranged for personal bank loans of $50,000, to enable them to buy Blazon stock. As collateral for the loan, Lloyd and Larson pledged a $50,000 certificate of deposit purchased by Blazon with proceeds of the offering. The loan fell into default and the bank foreclosed on the pledged certificate. The Commission was not told about any of these changes; no amendments to the original filing were made, and the offering circular shown to prospective purchasers was not amended to show the changes.
 
 
 16
 Larson was replaced as Blazon's counsel on April 10, 1974. At the same time, the Blazon Directors replaced Lloyd as President. All of the foregoing facts are established in the record, without contradiction. Thus the trial judge could rely upon them in support of the Commission's motion for summary judgment.
 
 
 17
 On July 22, 1975, the Commission filed this action, naming as defendants Blazon, Lloyd, Larson, Utah and McMurray. The defendants raised the affirmative defenses of improper jurisdiction, lack of in personam jurisdiction, insufficiency of service of process and failure to state a claim of fraud with particularity. The district court overruled them.
 
 
 18
 II. In Personam Jurisdiction.
 
 
 19
 A. Timeliness of the Appeal.
 
 
 20
 The appeal of Utah and McMurray claiming lack of in personam jurisdiction is timely. The orders of the district court denying these defendants' motion to dismiss and motion for summary judgment and striking their affirmative defenses were not appealable before the entry of the final judgment. See, e. g., American Concrete Agricultural Pipe Association v. No-Joint Concrete Pipe Co., 9 Cir., 1964, 331 F.2d 706, 709; Oppenheimer v. Los Angeles County Flood Control District, 9 Cir., 1972, 453 F.2d 895; 2A Moore, Federal Practice, 2d ed., P P 12.14 n.11, 12.21 n.44.
 
 
 21
 B. Venue.
 
 
 22
 Utah and McMurray argue that venue in the Northern District of California was improper. They say that, because venue is a statutory prerequisite to the nationwide service of process allowed by the securities acts, (Securities Exchange Act, § 27, (15 U.S.C. § 78aa), and Securities Act, § 22(a), (15 U.S.C. § 77v(a))) the court did not acquire jurisdiction over the persons of Utah or McMurray. They also argue that they did not acquiesce in the jurisdiction of the court by contesting the case on the merits because they properly asserted lack of jurisdiction in their answer to the Commission's complaint and in their motions to dismiss and for summary judgment. See Fed.R.Civ.Pro. 12(h); 2A Moore, Supra, P 12.23.
 
 
 23
 We find, however, that Utah and McMurray did acquiesce to the jurisdiction of the court by a stipulation. Because we find that the district court did have in personam jurisdiction over Utah and McMurray, and because their allegation of improper venue goes only to the issue of that jurisdiction, we need not consider whether venue was properly laid in the Northern District of California.
 
 
 24
 On September 16, 1975, in a stipulation for extension of time to respond to the Commission's complaint, McMurray and Utah, through their attorney, stipulated:
 
 
 25
 Defendants Utah Capital Corporation and Glenn W. McMurray acknowledge service of the Summons and Complaint upon them and acknowledge the jurisdiction of this Court over them and over the subject matter of this action.
 
 
 26
 A defendant cannot waive his right to assert a lack of subject matter jurisdiction, but he can confer jurisdiction over his person upon a court otherwise lacking that jurisdiction by expressly consenting to it. See, e. g., Neirbo Co. v. Bethlehem Shipbuilding Corp., Ltd., 1939, 308 U.S. 165, 167-168, 60 S.Ct. 153, 84 L.Ed. 167; General Investment Co. v. Lake Shore & M. S. R. Co., 1922, 260 U.S. 261, 272, 43 S.Ct. 106, 67 L.Ed. 244; Blank v. Bitker, 7 Cir., 1943, 135 F.2d 962, 965.
 
 
 27
 In the face of the explicit waiver signed by the defendants' attorney in this case, their argument that "It does not make sense that these parties would knowingly have intended such a waiver, when they might have obtained an extension of time directly from the District Court without waiving their defenses," does not make sense.
 
 
 28
 III. Fraudulent Intent.
 
 
 29
 Utah and McMurray also attack the judgment in favor of the Commission on Count I on substantive grounds. They say that a finding of fraudulent intent (intentional or willful conduct intended to defraud others) was required as a foundation for a finding that they violated the antifraud provisions, and that the intent was not proved. Because this action is brought under both § 10(b) of the Securities Exchange Act and § 17(a) of the Securities Act, we need not decide whether an injunction could be sustained in an action founded on § 10(b) alone or as implemented by Rule 10b-5, absent a showing of intent to defraud. It is enough that the injunction was properly issued under § 17(a).
 
 
 30
 A showing of fraudulent intent is not required in an action for an injunction brought by the Commission under § 17(a). The pertinent language of § 17(a) reads:
 
 
 31
 (a) It shall be unlawful for any person in the offer or sale of any securities . . .
 
 
 32
 (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 
 
 33
 (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.
 
 
 34
 On its face, the language of subsection (2) does not require a fraudulent intent. All that is required is "any untrue statement of a material fact" or "any omission to state a material fact." And, as Judge Mansfield said in SEC v. Coven, 2 Cir., 1978, 581 F.2d 1020, at 1026, "the clear import of the critical phrase in subsection (3), 'operates as a fraud,' is to focus attention on the Effect of potentially misleading conduct on the public, not on the culpability of the person responsible." (emphasis in original, footnote omitted)
 
 
 35
 Considering the purposes of an injunction, to assure compliance with the act, and to protect the public against future noncompliance, we see no reason to require a finding of specific intent to defraud as a predicate for the injunction under § 17(a). Accord, SEC v. American Realty Trust, 4 Cir., 1978, 586 F.2d 1001, 1005-1007; SEC v. Coven, supra; SEC v. World Mission Radio, Inc., 1 Cir., 1976, 544 F.2d 535, 540-541 n.10; SEC v. Shapiro, 2 Cir., 1974, 494 F.2d 1301, 1308.
 
 
 36
 The principal reliance of Utah and McMurray is on Ernst & Ernst v. Hochfelder, 1976, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668. That case is not in point here, for two reasons. First, it involved only § 10(b) and Rule 10b-5, and the Court relied heavily on the language of § 10(b):
 
 
 37
 It shall be unlawful for any person . . .
 
 
 38
 (b) To use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules . . . as the Commission may prescribe . . ..
 
 
 39
 This is very different language from that of § 17(a)(2) and (3), quoted Supra. The Court concluded that the words "manipulative or deceptive device or contrivance" implied a requirement of "scienter," which the Court defined as "intent to deceive, manipulate, or defraud" (Id. at 193, 96 S.Ct. at 1381). The action was brought by private parties for damages. The Court held that "scienter" is required in such a case because the words used "strongly suggest that § 10(b) was intended to proscribe knowing or intentional misconduct." (Id. at 197, 96 S.Ct. at 1383). And, because Rule 10b-5 was adopted under § 10(b), the Court also required "scienter" when the rule was relied upon. It so held as to subsections (b) and (c) of Rule 10b-5, even though the language of those subsections is identical to that of § 17(a)(2) and (3). It did so because the Commission could not, in a rule adopted under § 10(b), proscribe conduct not proscribed under § 10(b).
 
 
 40
 No such reasoning applies to § 17(a)(2) and (3), however. Section 17 is an act of Congress, not a rule of the Commission. See SEC v. Coven, supra, 581 F.2d at 1026-1027.
 
 
 41
 Second, in Ernst & Ernst, the Court expressly left open "the question whether scienter is a necessary element in an action for injunctive relief under § 10(b) and Rule 10b-5," citing SEC v. Capital Gains Research Bureau, 1963, 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237. (425 U.S. at 194 n. 12, 96 S.Ct. at 1381 n. 12.) We need not now decide the question that the Court reserved. But the fact that the Court did reserve it in a § 10(b) case strengthens our conviction that the Court would not require "scienter" in an injunction case under § 17(a)(2) and (3).[2]
 
 
 42
 The district court was correct in granting summary judgment in favor of the Commission on Count I.
 
 
 43
 IV. Propriety of the Review Provision in the Injunction.
 
 
 44
 The injunction entered by the district court provides:
 
 
 45
 IT IS HEREBY FURTHER ORDERED that the defendants may move for dissolution of this injunction at any time following eighteen (18) months from the date of entry of this order provided that in support of such a motion defendants demonstrate compliance with the terms of the injunction and, provided further, that, notwithstanding such a showing by the defendants, the injunction shall continue in full force and effect if the plaintiff Securities and Exchange Commission demonstrates that the public interest so requires.
 
 
 46
 The Commission argues that this provision in the injunction was beyond the power of the court to include and that it was an abuse of discretion to include it. We do not agree.
 
 
 47
 The district court has wide discretion in framing an injunction. Mr. Justice Douglas described that discretion in Hecht Co. v. Bowles, 1944, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754, an action by the World War II Price Administrator to enforce compliance with the Emergency Price Control Act of 1942 (56 Stat. 23), in which the district court found violations, but declined to issue an injunction.
 
 
 48
 We are dealing here with the requirements of equity practice with a background of several hundred years of history. Only the other day we stated that "An appeal to the equity jurisdiction conferred on federal district courts is an appeal to the sound discretion which guides the determinations of courts of equity." Meredith v. (City of) Winter Haven, 320 U.S. 228, 235, (64 S.Ct. 7, 11, 88 L.Ed. 9). . . . The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. 321 U.S. at 329, 64 S.Ct. at 591-592. (emphasis added)
 
 
 49
 The Court held that the district court's discretion extended to denial of an injunction, even though violations were found.
 
 
 50
 We have repeatedly applied the principle of the Hecht Co. case in actions by the Commission for injunctions under the Securities and Securities Exchange Acts. See, e. g., SEC v. Arthur Young & Co., 9 Cir., 1979, 590 F.2d 785; SEC v. Koracorp Industries, Inc., 9 Cir., 1978, 575 F.2d 692, 701; SEC v. United Financial Group, Inc., 9 Cir., 1973, 474 F.2d 354, 358-359. See also, Rondeau v. Mosinee Paper Corp., 1975, 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12.
 
 
 51
 Closely in point is our decision in Porter v. Lux, 9 Cir., 1946, 157 F.2d 756. That, too, was an action for an injunction under the Emergency Price Control Act of 1942. The district court in that case found violations and issued an injunction. Two paragraphs of the injunction read:
 
 
 52
 This judgment and decree shall be effective from the date hereof until the 30th day of June, 1946. This judgment and decree is without prejudice to the right of the plaintiff to move for the extension of this judgment and decree beyond the date above mentioned upon appropriate showing of facts justifying such extension. The defendant likewise may move under appropriate circumstances for modification of this judgment and decree prior to the expiration thereof.
 
 
 53
 Jurisdiction of the court is retained over the parties and subject matter of this action for these purposes. Id. at 757.
 
 
 54
 The Price Administrator appealed, and we affirmed. We said:
 
 
 55
 It is well settled that this court will not interfere with the action of a District Court in the exercise of its discretion unless there has been a plain abuse of that discretion. Id. at 757. (footnote omitted)
 
 
 56
 Viewing the record we get the impression that the District Court concluded from the facts then before it that during the time fixed in the injunction opportunity would be afforded to observe the action of appellees and determine whether or not it could reasonably be assumed that they would obey the law in the future. If it was thought that they would not, then the simple procedure of a motion to extend the time was left open. The District Court from the picture it received from the facts and circumstances before it determined the action taken to be "the fairest course to follow" in this situation. Id. at 757.
 
 
 57
 (W)e are unable to say that the District Court's action constitutes " * * * a plain error, discretion exercised to an end not justified by the evidence, a judgment that is clearly against the logic and effect of the facts as are found."
 
 
 58
 No abuse of discretion appearing the judgment is affirmed. Id. at 758.
 
 
 59
 What we said there is equally applicable here.
 
 
 60
 We do not agree with the Commission's characterization of the injunction as a "limited injunction." The provision criticized by the Commission does not automatically terminate the injunction after 18 months; it merely provides to the defendants a right to seek a review after 18 months. The court did not abuse its discretion.
 
 
 61
 The Commission correctly argues that the standards for modification of a permanent, unconditional injunction are strict. United States v. Swift & Co., 1932, 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999. We do not now decide whether the review provision in the injunction was intended to change the otherwise strict standards for modification of an injunction or, if so, whether such action was within the discretion of the trial judge. Neither of these questions will be before us until the time, if ever, when the injunction is actually modified or dissolved.
 
 
 62
 V. Violation of § 5 of the Securities Act.
 
 
 63
 The Commission argues that the summary judgment for the defendants on Count II is erroneous because the defendants violated § 5(a) and (c) of the Securities Act which prohibit the sale of unregistered securities[3] by failing to amend their Reg. A Notification and Offering Circular and thus allowing it to become false and misleading. It argues that failure to comply with Rule 256e, which states in relevant part that "In no event shall an offering circular be used which is false or misleading in light of the circumstances then existing." results, Ab initio, in the loss of the exemption provided by § 3(b), and that, because the defendants did not otherwise register the stock of Blazon, they were therefore in violation of § 5. We think that this argument misinterprets § 3(b) and the exemption provided under Reg. A. False and misleading Reg. A registration materials do not automatically produce a violation of § 5.
 
 
 64
 In Mines & Metals Corp. v. SEC, 9 Cir., 1952, 200 F.2d 317, we implied that the legitimate filing of Reg. A registration materials the filing of such materials when the offering was for less than the dollar limitation would preclude the finding of a violation of § 5. There, we were considering the appropriateness of an investigation to determine compliance with § 5. Because no Reg. A materials had been filed, we did not decide what the effect of such filing would be on the scope of the investigation.
 
 
 65
 Exemptions from the registration requirements of the Securities Act are construed narrowly. The burden of proof is on the person who would claim such an exemption. SEC v. Ralston Purina Co., 1953, 346 U.S. 119, 126, 73 S.Ct. 981, 97 L.Ed. 1494; SEC v. Sunbeam Gold Mines Co., 9 Cir., 1938, 95 F.2d 699, 701. However, we think that the Commission would have us misapply these principles in a case concerning § 3(b) and Reg. A.
 
 
 66
 The threshold requirement for qualification for a Reg. A exemption is the dollar limitation on the size of the offering. If that requirement is met, the issuer must file the appropriate forms with the Commission. Failure to comply with either the dollar limitation or the filing requirements will result in a loss of the exemption and a violation of § 5. See, e. g., Mines & Metals Corp. v. SEC, supra, 200 F.2d 320-321.
 
 
 67
 However, incomplete or inadequate filing, or filing which becomes incomplete or inadequate, will not result in an automatic loss of the Reg. A exemption. Reg. A provides the Commission with a less severe mechanism to deal with such problems the Commission may suspend the exemption.[4] If the Commission's claim were allowed, the procedure for suspension of the exemption adopted by Reg. A would be circumvented. Tabby's International, Inc. v. SEC, 5 Cir., 1973, 479 F.2d 1080, cited by the Commission, supports the conclusion which we reach here by demonstrating the adequacy of the suspension procedure to deal with false and misleading Reg. A documents.
 
 
 68
 In both appeals, we affirm.
 
 
 
 *
 The Honorable Samuel P. King, Chief Judge, United States District Court for the District of Hawaii, sitting by designation
 
 
 [1]
 Section 3(b) provided at that time:
 The Commission may from time to time by its rules and regulations, and subject to such terms and conditions as may be prescribed therein, add any class of securities to the securities exempted as provided in this section, if it finds that the enforcement of this subchapter with respect to such securities is not necessary in the public interest and for the protection of investors by reason of the small amount involved or the limited character of the public offering; but no issue of securities shall be exempted under this subsection where the aggregate amount at which such issue is offered to the public exceeds $500,000.
 The Commission promulgated Reg. A under this statutory authority.
 Reg. A provides that, to qualify for the exemption under Section 3(b), an issuer of securities must, before beginning its offering, file with the Commission's appropriate regional office, a Notification on Form 1-A. The Notification has as an exhibit the Offering Circular to be used in selling the securities. It must contain the disclosures that are to be made to potential buyers concerning the issuer and its securities. The Offering Circular's content is guided by Schedule I to Form 1-A and by the provision that "(i)n no event shall an offering circular be used which is false or misleading in the light of the circumstances then existing." 17 C.F.R. 230.256(e) (Rule 256). An offering circular must be given to each buyer before or with the confirmation of the sale or before payment for the securities, whichever occurs first. Rule 256 also provides that if the offering is not completed within nine months from the date of commencement, a revised Offering Circular shall be filed. Six months after the offering begins, and again when it ends, the issuer must file a report on Form 2-A detailing the amount of securities sold, the manner in which the proceeds are being spent, and the nature and extent of the issuer's activities as of the report date.
 
 
 [2]
 In United States v. Charnay, 9 Cir., 1976, 537 F.2d 341, 358-359, we held that scienter must be shown in a criminal action under § 10(b) and Rule 10b-5. That action was brought only under § 10(b) and not under § 17(a) and thus that decision does not control our decision in this case
 
 
 [3]
 Section 5(a), 15 U.S.C. § 77e(a), provides:
 Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly
 (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or
 (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.
 Section 5(c), 15 U.S.C. § 77e(c), provides:
 It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title.
 
 
 [4]
 Rule 261, 17 C.F.R. 230.261, promulgated by the Commission pursuant to Securities Act § 3(b), provides the procedure by which a Reg. A exemption may be suspended. Rule 261(a)(2) provides that:
 (a) The Commission may, at any time after the filing of a notification, enter an order temporarily suspending the exemption, if it has reason to believe that . . .
 (2) the notification, the offering circular or any other sales literature contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they are made, not misleading.
 Rule 261 also provides for notice and an opportunity for a hearing after such temporary suspension, and allows a permanent suspension of the exemption after such procedural safeguards are met.