SECURITIES AND EXCHANGE COMMISSION, Plaintiff-Appellant,

v.

KORACORP INDUSTRIES, INC., et al., Defendants-Appellees.

Nos. 76–2547 and 76–2964.

United States Court of Appeals, Ninth Circuit.

Feb. 6, 1978.

Rehearing Denied May 24, 1978.

---

David Ferber (argued), Washington, D. C., for plaintiff-appellant.

Richard J. Archer (argued), of Sullivan, Jones & Archer, Ralph Golub (argued), Goldstein Barceloux, & Goldstein, San Francisco, Cal., Jack I. Samet (argued), of Ball, Hunt, Hart, Brown & Baerwitz, Los Angeles, Cal., G. Douglas Floyd (argued), of Pillsbury, Madison & Sutro, San Francisco, Cal., for defendants-appellees.

Before CARTER and HUFSTEDLER, Circuit Judges, and SMITH,* District Judge.

HUFSTEDLER, Circuit Judge:

The Securities and Exchange Commission ("SEC") brought these two suits to obtain injunctions preventing the defendants from committing future violations of the anti-fraud and reporting provisions of the federal securities laws. The district judge granted defendants' motions for summary judgment. The SEC appeals, contending that since material issues of fact are in dispute, the district court abused its discretion in granting summary judgment. We agree with the SEC with respect to all of the defendants except Arthur Andersen & Co. ("Andersen"). With respect to Andersen, we conclude that there was no genuine dispute as to any material fact, summary judgment was permissible, and the district court acted within the scope of its discretion in denying the injunctive relief sought.

Defendant Koracorp Industries, Inc. ("Koracorp") is a corporation, engaged in a number of business enterprises, whose common stock is publicly traded on the New York and Pacific Coast Stock Exchanges. Defendant Koratec Communications, Inc. ("KCI") was a wholly-owned subsidiary of Koracorp whose principal business was the publication of a controlled-circulation advertising magazine, "Homemaking with a Flair" ("Flair"), which was used for direct mail promotion. Defendant Weil was the president of KCI, defendant Cunningham was a vice president and director of Koracorp, and defendant Helfat was chief executive officer and president of Koracorp.

According to evidence presented by the SEC, Weil was the chief architect of the fraud. Weil's compensation depended in part upon the volume of KCI's business. Weil was able to increase his compensation by causing to be placed and carried on KCI's books millions of dollars of uncollectible, and sometimes wholly fictitious, accounts receivable. The SEC claimed that Weil also used these overbooked receivables to conceal kickbacks that were paid to him by corporations with which KCI did busi-

* Honorable Russell E. Smith, Chief Judge, United States District Court, District of Montana, sitting by designation.

ness. KCI's financial statements were consolidated with Koracorp's. When KCI's stack of receivables collapsed, Koracorp had to reverse over five million dollars which had been improperly shown as income on its books.

Defendant Andersen, Koracorp's accounting firm, first became aware of irregularities in KCI's accounts receivable while preparing its audit of Koracorp's 1970 financial statement. Andersen received a poor response from selected KCI customers with whom it attempted to confirm receivables. When its examination of contracts and collections failed adequately to support receivables in the amounts recorded, Andersen insisted that KCI's 1970 reserves for uncollectible accounts be increased, and it furnished Koracorp with critical comments concerning the inadequate documentation of transactions at KCI. In its 1971 and 1972 audits, Andersen again attempted to obtain confirmation for KCI's receivables from its customers, and repeatedly cautioned Koracorp about the deficient control procedures and the inadequate written documentation of transactions at KCI. The SEC produced evidence that the principals of KCI, with the assistance, or at least the passive neglect, of one or more of the principals of Koracorp, tried to cover up the overbooked receivables of KCI. By early May, 1973, the accounts receivable of KCI had grown to almost six million dollars, of which five million dollars was long past due or had never been billed. Cunningham and Helfat were aware of the receivables debacle, and Helfat directed that an internal investigation be conducted.

Following that investigation, Weil, in early August, 1973, admitted to Helfat that almost all of KCI's 1972 accounts receivable from advertising were uncollectible. Koracorp directed Andersen to conduct a special investigation into the accounts receivable situation at KCI. Andersen learned that substantially all of the 1972 confirmed accounts were now disavowed by customers and that the information obtained during the 1972 audit had been misrepresented. On August 7, Koracorp informed the New York and Pacific Coast Stock Exchanges and the SEC, and on August 8, the SEC suspended all trading in Koracorp's securities. On September 10, 1973, Andersen withdrew its auditor's report on Koracorp's 1972 financial statement. The original 1972 financial statement reported earnings per share of $0.27. After restatement in early 1974, by which time five million dollars of improperly stated income of KCI had been reversed, the 1972 revised financial statement showed a loss of $1.02 per share. Trading in Koracorp's securities was not permitted to be resumed until early 1974.

Meanwhile, at a special Koracorp board of directors' meeting on August 7, 1973, the board was informed by Cunningham of KCI's overstated accounts receivable and by Helfat of Weil's offer to purchase Flair. The board agreed to the sale of Flair to Weil, contingent upon his resignation as president of KCI. On August 24, 1973, the Koracorp board of directors requested Helfat's resignation as president and director of Koracorp, but retained him as a special consultant at full salary with all fringe benefits. The board also removed Cunningham from his position as vice president, after he refused to resign. Cunningham remained as a director of Koracorp until May, 1975. Both Cunningham and Helfat received bonuses based upon Koracorp's original 1972 earnings of $0.27 per share.

After a two-year investigation, the SEC filed these complaints in November, 1975. The SEC alleged that Weil was directly responsible for overbooking accounts receivable and for diverting funds from KCI by collecting illegal kickbacks from Flair's customers. These kickbacks were made to corporations that he and his wife owned, defendants Western Gateway Corp., Verve, Inc., Associated Graphics, Inc., and Allison Production Affiliates, Inc. The SEC also alleged that Helfat and Cunningham knew about the fraud and participated in the cover-up by failing to disclose to the Koracorp board and to the public their knowledge of the spurious accounts receivable, the illegal kickbacks to Weil, and the other irregularities in KCI.

The SEC contended that Andersen was negligent in its audits of Koracorp and in its failure to uncover the KCI scheme. The SEC did not claim that Andersen did any affirmative acts in connection with violations of the securities laws by the principals of Koracorp and KCI, nor did it contend that Andersen had any actual knowledge of the fraud or of the reporting irregularities.

The SEC sought injunctions against the ten individual and corporate defendants to prevent their participating in any future violations of the federal securities laws. At the initial hearing before the district court, the court accepted suggestions by the defendants that the nature of the defendants' activities in connection with the violations was not significant in deciding whether injunctions should issue. The court accordingly restricted the inquiry into the conduct of the parties after the exposure of the fraud in August, 1973. The court also limited discovery to post-August, 1973, matters, "so that they [the defendants] can use that as a basis for motions for dismissal or summary judgment."

The SEC and Andersen both filed motions for summary judgment. The remaining defendants also accepted the district court's invitation by filing motions for summary judgment. We reverse summary judgment in favor of the defendants, other than Andersen, because the district court improperly allocated the burden of persuasion on motion for summary judgment, and triable issues of material fact foreclosed judgment in those defendants' favor. We affirm summary judgment for Andersen because no material issues of fact remained in dispute, and the district court did not abuse its discretion in denying injunctive relief against Andersen.

## I

Everyone agrees that the manipulation of KCI and Koracorp, the cover-up activities in which these corporations were engaged, and the diversion of funds from KCI in the form of "commissions" or "kickbacks" involved serious violations of the securities laws conducted over a period of several years. Everyone also agrees that, after the collapse of KCI and the exposure of the fraud, violations ceased. No violations had occurred for about eighteen months before the district court granted summary judgment to the defendants. Finally, everyone agrees that the evidence presented to the district court concerning the nature and extent of the participation of the various defendants in the violations was sharply conflicting.

Weil, Helfat, Cunningham, Koracorp, and KCI convinced the district court that all of the disputed facts were immaterial because each of them had conceded, solely for the purpose of the summary judgment, that each was potentially liable in some unidentified respect for the violations. The nature of these concessions is aptly described in one of the defendants' briefs: "[T]he moving Defendants conceded, in the court below, the existence of conflicts in the evidence concerning culpability in 1973." In addition to these "admissions," the defendants offered evidence tending to prove reformation, and in some instances, changed circumstances, making it unlikely that some of the individuals would re-engage in securities transactions.

The primary purpose of injunctive relief against violators of the federal securities laws is to deter future violations, not to punish the violators. (*Hecht Co. v. Bowles* (1944) 321 U.S. 321, 329, 64 S.Ct. 587, 88 L.Ed. 754.) The central issue, therefore, is whether as a matter of law the district court could conclude that "there was no significant threat of future violation." (*United States v. W. T. Grant Co.* (1953) 345 U.S. 629, 635, 73 S.Ct. 894, 899, 97 L.Ed. 1303.) If the nature and extent of the culpability of the several defendants is a material fact, summary judgment must be reversed because culpability was hotly disputed.

The burden was upon the KCI and Koracorp defendants, as the parties moving for summary judgment, clearly to establish the non-existence of any genuine issue of fact material to judgment in their favor.

(6 Pt. 2 J. Moore, *Federal Practice* ¶ 56.-15[4], p. 56–511.) In granting these defendants' motions for summary judgment, the district court erroneously reversed the burden, stating, "[i]n attempting to meet its burden of showing a reasonable expectation of further violations, the SEC seemed more concerned with creating a factual pattern which would thwart the motion for summary judgment than establishing hard facts on which such an expectation could be asserted."

■ The district court could not grant summary judgment unless the defendants were entitled to judgment as a matter of law. "[T]he moving party has the burden of clearly establishing the lack of any triable issue, although the opposing party would at trial have the burden of proof on a particular issue. It is not the function of the trial court at the summary judgment hearing to resolve any genuine factual issue, including credibility; and for the purpose of ruling on the motion all factual inferences are to be taken against the moving party and in favor of the opposing party, and the appellate court will do likewise in reviewing the trial court's grant of summary judgment. Discretion plays no real role in the grant of summary judgment: the grant of summary judgment must be proper under the above principles or the grant is subject to reversal." (6 Pt. 2 J. Moore, *Federal Practice, supra*, ¶ 56.15[8], p. 56–643.)

■ An inference arises from illegal past conduct that future violations may occur. (*SEC v. Culpepper* (2d Cir. 1959) 270 F.2d 241; *SEC v. Keller* (7th Cir. 1963) 323 F.2d 397, 402.) The fact that illegal conduct has ceased does not foreclose injunctive relief. (*United States v. W. T. Grant Co., supra*, 345 U.S. at 633, 73 S.Ct. 894; *Los Angeles Trust Deed & Mortgage Exchange v. SEC* (9th Cir. 1960) 285 F.2d 162; *SEC v. Manor Nursing Centers, Inc.* (2d Cir. 1972) 458 F.2d 1082.) Promises of reformation and acts of contrition are relevant in deciding whether an injunction shall issue, but neither is conclusive or even necessarily persuasive, especially if no evidence of remorse surfaces until the violator is caught. (*United States v. Parke, Davis & Co.* (1960) 362 U.S. 29, 48, 80 S.Ct. 503, 514, 4 L.Ed.2d 505. ("A trial court's wide discretion in fashioning remedies is not to be exercised to deny relief altogether by lightly inferring an abandonment of the unlawful activities from a cessation which seems timed to anticipate suit.").) [1] Moreover, courts must be particularly skeptical about attaching any significance to contrition under protest. (*E. g., SEC v. Manor Nursing Centers, Inc., supra*, 458 F.2d at 1101.) The changed circumstances of the violator are also relevant in determining whether an injunction shall issue, but neither changing jobs nor deterioration of health, in and of itself, or in combination with the cessation of illegal activities and proclaimed reformation, provides a complete defense to an injunction suit. (*E. g., SEC v. Pearson* (10th Cir. 1970) 426 F.2d 1339.) [2]

■ When the burden of proof is properly allocated to the defendants and the inferences are drawn against them, it is evident that the uncontroverted facts failed to disclose defenses sufficient to defeat the SEC's suits as a matter of law. Therefore, we turn to the question whether the disputed facts presented triable issues. The na-

---

1. We are reminded of the wry observation of the Seventh Circuit in rejecting the contention of some securities law violators that no injunction was necessary because they had repented and had no intention of repeating their misdeeds: "They came into court with a contrite heart and with the intention to forget and forgive if the Government would meet them half way." (*American Safety Table Co. v. Singer Sewing Machine Co.* (3d Cir. 1938) 95 F.2d 543, 553.)

2. Of course, there are circumstances in which any opportunity to repeat past violations is so remote that summary judgment may be proper. For example, in *SEC v. Penn Central Co.* (E.D. Pa.1976), 425 F.Supp. 593, a defendant who was partially paralyzed by an acute stroke and who suffered other serious physical disabilities was granted summary judgment. The precarious state of his health made his re-entry into the securities field too remote, as a matter of law, to warrant the issuance of an injunction against him.

ture and extent of the culpability of the several defendants are material. Assessing the likelihood of recurrent violations of the securities laws requires a prediction of future conduct, and that, in turn, requires the court to prove the defendants' states of mind. Two facts are critical to this inquiry: "the character of past violations" and "the bona fides of the expressed intent to comply." (*United States v. W. T. Grant Co., supra*, 345 U.S. at 633, 73 S.Ct. at 898. *See also SEC v. National Student Marketing Corp.* (D.D.C.1973) 360 F.Supp. 284, 297.) As Professor Loss points out: "The ultimate test is whether the defendant's past conduct indicates—under all of the circumstances and not merely in view of the time which has elapsed since the last violation—that there is a reasonable likelihood of further violations in the future." (3 Loss, *Securities Regulation* (2d ed. 1961) at 1976.)

■ Neither the character of a defendant's past violations nor the bona fides of an expressed intent to comply can be ascertained without determination of the acts and conduct of each of these defendants in connection with the securities violations. An admission that illegal acts occurred for which someone had responsibility, perhaps a little bit of which might be attributed to a particular defendant, provides no clue to any defendant's state of mind for use as a predictor of his future conduct. An exploration of the nature and equality of the conduct of each defendant cannot be avoided by "admissions" that violations occurred for which responsibility need not be allocated.

■ One or more of these defendants was responsible for gross fraud, for diversion of corporate funds, and for active cover-up of the misdeeds. The allocation of responsibility depends heavily upon the credibility of the testimony of the several defendants. The courts have long recognized that summary judgment is singularly inappropriate where credibility is at issue.

Only after an evidentiary hearing or a full trial can these credibility issues be appropriately resolved. (*See, e. g., Poller v. Columbia Broadcasting System, Inc.* (1962) 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 758; *United States v. Perry* (9th Cir. 1970) 431 F.2d 1020, 1022; 10 C. Wright & A. Miller, *Federal Practice and Procedure* § 2726 (1973). *Accord* Note of the Advisory Committee on Amended Rule 56 ("Where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate.") 31 F.R.D. 648 (1963).)

■ The general rule proscribing summary judgment where credibility is in question is particularly pertinent here. Defendants assert that they are now reformed and will never violate the securities laws again. The promises of defendants to obey the law and not to re-enter the securities market are, of course, expressions of the defendants' states of mind and are relevant to a determination of the likelihood of repetition. These statements are, however, necessarily self-serving and highly dependent on the credibility of the individuals making the statements. The fact that illegal conduct ceased provides no further support for defendants' assurances that injunctive relief is unnecessary where the acts of contrition and process of reformation did not begin until the defendants must have realized that the accounts receivable scandal could no longer be kept hidden. (*Cf. United States v. Parke, Davis & Co., supra*, 362 U.S. 29, 48, 80 S.Ct. 503, 4 L.Ed.2d 505.) On this record, the district court could not decide that these defendants, or any of them, would not be recidivists.[3]

II

Summary judgment in favor of Andersen arose in a different context. Both the SEC and Andersen filed motions for summary judgment, each contending that it was enti-

---

**3.** We, of course, express no views on the ultimate merits of the case. Nothing we have said should be read as implying a direction to the district court about the appropriate balancing of equities in the issuance or refusal to issue an injunction once the factual issues in dispute have been resolved.

tled to judgment and that there were no genuine issues of fact. The SEC charged Andersen with simple negligence in the pre-August, 1973, period by reason of its failure to uncover the receivables fraud and with willful failure to disclose to the public the details of the KCI receivables fraud during the post-August, 1973, period, during the course of Andersen's special investigation.

The facts surrounding Andersen's audits of Koracorp's financial statements in the years 1970 through 1972, its special investigation in 1973, and its 1974 audit work on Koracorp's restated 1972 financial statement are not controverted. Andersen's statement of facts on its motion for summary judgment was adopted by the SEC in its brief in support of its own motion before the district court. The SEC's statement of undisputed facts was likewise not controverted by Andersen.

Upon the basis of these facts, Andersen, solely for the purpose of summary judgment, conceded that the firm's failure to uncover the receivables fraud was due to simple negligence. The SEC accepted that concession as to Andersen's pre-August, 1973, activities. The SEC, however, also claimed that Andersen was guilty of willful failure to disclose to the public details of the KCI receivables fraud during the period from August, 1973, to February 28, 1974.

We first address the question whether Andersen's failure to disclose to the public its findings as it pursued its special investigation was a violation of the federal securities laws. It is uncontested that Andersen along with Koracorp informed the New York and Pacific Coast Stock Exchanges and the SEC of the overbooking of accounts receivable on August 8. Although Andersen had not completed its special investigation in September, Andersen advised the SEC that it was withdrawing its consent to the use of its prior auditor's report in connection with Koracorp's 1972 financial statement, and it confirmed its understanding that Koracorp would "notify the Securities and Exchange Commission forthwith and . . . promptly make appropriate disclosure to the public and to the New York Stock Exchange." In the interim, the SEC had suspended all trading in Koracorp's securities. Commencing in October, 1973, the SEC began its own extensive investigation of the Koracorp problems. The SEC deposed all of the key Andersen personnel involved in the Koracorp audits, obtained production of documents, including Andersen's work papers, memoranda, correspondence, and reports relating to those audits. Andersen and its personnel voluntarily cooperated with the SEC's investigation both as to document production and deposition testimony.

The SEC's argument that Andersen violated some kind of duty in reporting its findings during its special investigation is hard to follow. As nearly as we can ascertain, its claim of misconduct rests upon a contention that, in Andersen's September 10, 1973, letter to Koracorp and the SEC, withdrawing its consent to the use of its report on Koracorp's 1976 financial statement, Andersen was too cautious in its language. The Andersen letter stated that the information it had obtained "indicates the possibility that the consolidated financial statements of Koracorp Industries, Inc. for the year ended December 29, 1972, may require adjustments," and that "significant amounts of accounts receivable of that subsidiary (KCI) may have been included in these financial statements erroneously . . . ." The SEC argues that Andersen was engaged in a cover-up because it did not then and there state that "egregious management fraud had occurred." The SEC cites no authority and we have found none that poses a duty upon an accountant in the middle of a special investigation to make a public announcement that the company whose affairs it is investigating is guilty of fraud. There was nothing in the record before the district court which permitted an inference that, under the circumstances of this case, Andersen was guilty of any kind of concealment. Moreover, there is nothing in the record suggesting that the alleged failure to disclose was material to investors. The fact of fraud had been revealed, even if it was not presented in lan-

guage that the SEC might have chosen. Trading in Koracorp had been suspended for a month preceding Andersen's letter and remained suspended for another five months.

█ The only other fact to which the SEC points to support its contention that Andersen was guilty of a kind of culpable non-disclosure is that Andersen's February 28, 1974, report on Koracorp's restated 1972 financial statement said that "sufficient information is not available at present to determine the amount of the adjustment relating to this discontinued operation which may be applicable to periods prior to 1972." But the SEC points to nothing that casts any doubt about the accuracy of that statement. The SEC argues that the statement was misleading because it did not also tell investors either how or why the KCI receivables were improperly booked. Perhaps there may be situations in which a failure to report results of an ongoing investigation in greater detail may be misleading, but the record in this case does not support the inferences that the SEC asks us to draw. The SEC has not given us any reason why there was a substantial likelihood that a reasonable shareholder in 1974 would consider the omitted details of any significance. (*See TSC Industries, Inc. v. Northway, Inc.* (1976) 426 U.S. 438, 448–49, 96 S.Ct. 2126, 48 L.Ed.2d 757.) By 1974, Andersen had already audited Koracorp's year-end 1973 report, trading in Koracorp had been suspended, and there had been substantial public disclosure with respect to the KCI scandal.

We are left then with the SEC's claim that Andersen's failure to detect the overbooking scheme before August, 1973, constituted simple negligence for which injunctive relief would be appropriate.[4]

Unlike the Koracorp and KCI defendants, Andersen's conduct in these transactions was fully exposed, and its state of mind was not in issue. No triable issue of fact remained, as both the SEC and Andersen agreed below. The record thus presented to the district court on the cross-motions for summary judgment the issues: (1) Is injunctive relief under Section 10(b) and Rule 10b–5 available to the SEC against an independent auditor who was guilty of simple negligence, and (2) if the relief is available, did the district court abuse its discretion in refusing to grant injunctive relief?

█ We need not reach the first question, which was specifically left open in *Ernst & Ernst v. Hochfelder* (1976), 425 U.S. 185, 194 n.12, 96 S.Ct. 1375, 47 L.Ed.2d 668 on this appeal because, even if we assume that simple negligence is enough to sustain the SEC's suit for an injunction, the district court was nevertheless free to exercise its discretion in denying equitable relief against Andersen. No *per se* rule requiring the issuance of an injunction upon the showing of past violation exists. (*SEC v. Bausch & Lomb, Inc.* (2d Cir. 1977) 565 F.2d 8, 18; *SEC v. Management Dynamics, Inc.* (2d Cir. 1975) 515 F.2d 801, 807.) The critical issue is whether there is a reasonable likelihood that the wrong would be repeated. The district court has a significant degree of latitude in making that determination. "[T]he court always is free to direct the entry of summary judgment for defendant where there are no genuine issues of material fact and the court is unwilling to award plaintiff discretionary relief." (10 C. Wright & A. Miller, *Federal Practice and Procedure, supra,* § 2731, at p. 605.) The SEC has failed to show that the district court abused the discretion accorded it. (*SEC v. Bausch & Lomb, Inc., supra,* 565 F.2d at 18.) Although we might have reached a different conclusion if we were sitting as a district court, we cannot say that the district court abused its discretion

---

**4.** The SEC also argues on appeal that Andersen's failure to uncover the fraud was reckless. That contention, however, was not made before the district court, and we, therefore, decline to consider it on appeal. Reliance upon simple negligence, of course, was understandable because at the time the issue was presented to the district court, no shadow had been cast upon *White v. Abrams* (9th Cir. 1974), 495 F.2d 724, holding that, even in private actions, negligence could be a basis for liability.

in declining to issue an injunction against Andersen.[5]

Judgment in favor of Andersen is affirmed. The judgments in favor of the remaining defendants are reversed and the causes are remanded to the district court for further proceedings consistent with the views herein expressed.

JAMES M. CARTER, Circuit Judge, concurring:

I am disturbed by the fact that the majority sends this case back for evidentiary hearings to a busy district court (the Northern District of California at San Francisco) apparently to find specifically the extent of each individual defendant's bad conduct and what his responsibility was in the overall picture. An evidentiary hearing to ascertain the various misdeeds and responsibility of each defendant in connection therewith could well require months of a district court's time. The same issues are present in civil actions pending against these defendants. In some way extensive evidentiary hearings in this case ought to be avoidable on remand to the district court.

The record shows that the individual defendants made admissions that violations occurred, but did not take any responsibility for particular violations (see majority opinion, *supra,* 575 F.2d 699). In view of the pending civil suits against these defendants it is understandable that they are unwilling to make further admissions as to their complicity in the overall scheme. However, perhaps they could make more specific admissions for the purpose of this motion only. Or perhaps the district judge on his own could explicitly assume that the charges by the S.E.C. against each defendant were proven. I think that if the individual defendants admitted for the purposes of this motion only, or if the district judge assumed as proven, the specific charges as set forth in the majority opinion (575 F.2d 696), then there would no longer be a genuine issue as to any material fact. Summary judgment could then be entered without need of a long evidentiary hearing.

---

5. Nothing we have said suggests that we have expressed any view upon the liability, if any, of Andersen for common law negligence.