SHERMAN OAKS MEDICAL ARTS CENTER, LTD., Plaintiff-Appellant,

v.

CARPENTERS LOCAL UNION NO. 1936, UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA; Los Angeles County Building and Construction Trades Council; Southern California District Council of Carpenters; Local Union 416 Reinforcing Iron Workers International Association of Bridge, Structural and Ornamental Iron Workers, AFL–CIO; Cement Masons Local Union No. 893, Operative Plasterers and Cement Masons International Union of the United States and Canada, AFL–CIO, Defendants-Appellees.

No. 81–5307.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 1, 1982.

Decided June 29, 1982.

Eugene P. McMenamin, Jr., Atkinson, Andelson, Rudd & Romo, Huntington Beach, Cal., for plaintiff-appellant.

Howard Z. Rosen, Robert M. Simpson, Rose, Klein & Marias, Los Angeles, Cal., argued, for defendants-appellees; Geffner & Satzman, Dennis Moss, Davis, Frommer & Jesinger, Los Angeles, Cal., on brief.

Before HUG, TANG and PREGERSON, Circuit Judges.

HUG, Circuit Judge:

Sherman Oaks Medical Arts Center, Ltd. ("Sherman Oaks") brought this action against the Carpenters Local Union No. 1913, the Cement Masons Local Union No. 893, the Reinforcing Iron Workers Local Union No. 416, and the Los Angeles Building and Construction Trades Council (collectively, "the unions") pursuant to section 303 of the Labor-Management Relations Act, 29 U.S.C. § 187. The complaint alleged two separate counts and the district court granted a summary judgment for the unions on both counts. Sherman Oaks appeals only from the summary judgment pertaining to Count One.[1]

In Count One of its first amended complaint, Sherman Oaks alleged that the unions, in violation of 29 U.S.C. § 158(b)(4)(B), engaged in common situs picketing with the intent to encourage the employees of neutral subcontractors to strike or refuse to work at the jobsite of Sherman Oaks's construction project in order to force Sherman Oaks to cease doing business with Arvizu Construction, Inc., a non-union subcontractor. Sherman Oaks contended that the unions' activities resulted in it incurring damages due to construction delays and increased costs. In granting summary judgment for the unions on Count One, the district court found that they did not intend to involve the employees of neutral secondary employers in the labor dispute. Because we conclude that there exist genuine issues of material fact concerning the legality of the unions' objectives, we reverse the district court's grant of summary judgment.

Sherman Oaks is a limited partnership engaged in the business of developing a

---

1. The second count alleged that both the Carpenters' and the Cement Masons' Master Labor Agreements contained "hot cargo" clauses violative of Section 158(e) of the National Labor Relations Act, 29 U.S.C. § 158(e), and that by picketing to compel an employer to enter into such agreements, the unions committed an unfair labor practice.

medical office building in Sherman Oaks, California. Sherman Oaks retained a general contractor to construct the building. The general contractor subcontracted the cement work for the building's parking structure to Arvizu Construction, Inc.

On December 12, 1978, approximately five months after construction began, the Carpenters Union placed a picket line on the jobsite in the vicinity of the parking structure. The purpose of the picket line was to force Arvizu to sign collective bargaining agreements with the Carpenters and the Cement Masons Unions. The placards carried by the pickets stated that Arvizu did not provide carpenters prevailing wages or conditions of employment and was thus unfair to the Carpenters Local. As a result of the picketing, numerous employees of other subcontractors refused to cross the picket line to perform their assigned work for their employers, and various suppliers refused to deliver materials to the jobsite for the other subcontractors. On January 9, 1979, the general contractor, in an effort to get the work on the building moving, informed the Carpenters Union that Arvizu would be removed from the jobsite from January 11 through January 14, 1979. On the morning of January 11, the pickets appeared on the jobsite carrying signs that stated only: "JOB UNSAFE." After the pickets were informed that the job had not been declared unsafe by OSHA, these signs were replaced with the signs declaring that Arvizu was unfair to the Carpenters Union.

The picketing continued until January 29, 1980, when the National Labor Relations Board charged the unions with an unlawful secondary boycott in violation of § 158(b)(4)(B) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4)(B), and obtained a temporary injunction prohibiting the unions from further picketing of the jobsite. Sherman Oaks subsequently brought this action for damages against the unions.

29 U.S.C. § 158(b)(4)(B) makes it an unfair labor practice "(i) to induce or encourage any individual employed by any person engaged in commerce ... to engage in ... a refusal in the course of his employment to use, ... transport, or otherwise handle or work on any goods, articles, materials ... or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce ... where ... an object ... is ... (B) forcing or requiring any person to cease using, selling ... or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person...."

Picketing at a construction site where more than one employer is engaged presents special problems. While a union may lawfully picket a primary employer with which it has a labor dispute, section 158(b)(4)(B) prevents it from exerting such economic pressure, where the object of such pressure is to force the employees of the general contractor or employees of neutral subcontractors to engage in a work stoppage in order to force the primary employer off the job. *NLRB v. Denver Bldg. & Construction Trades Council*, 341 U.S. 675, 687, 71 S.Ct. 943, 950, 95 L.Ed. 1284 (1951). It is not necessary to find that the sole object of the picketing was to force the general contractor to refuse to deal with the primary employer. *Id.* at 689, 71 S.Ct. at 951. Unlawful secondary activity will be found where it is only one of the unions' objectives. *See Pickens-Bond Construction Co. v. United Brotherhood of Carpenters*, 586 F.2d 1234, 1241 (8th Cir. 1978). Accordingly, the key to finding whether there has been a violation of section 158(b)(4)(B) is determining the object of the union's picketing. *Allied Concrete, Inc. v. NLRB*, 607 F.2d 827, 830 (9th Cir. 1979).

Where, as here, the union's picketing occurs at a common situs construction project, the NLRB has established guidelines for determining the object, and thus the legality, of the picketing. In *Sailors' Union of the Pacific (Moore Dry Dock)*, 92 N.L.R.B. 547 (1950), the NLRB announced four criteria, which, if met, raise a presumption that common situs picketing is directed against the primary and not a secondary employer. Those criteria are:

(a) The picketing is strictly limited to times when the situs of dispute is located on the secondary employer's premises; (b) at the time of the picketing the primary employer is engaged in its normal business at the situs; (c) the picketing is limited to places reasonably close to the location of the situs; and (d) the picketing discloses clearly that the dispute is with the primary employer.

*Id.* at 549 (footnotes omitted).

■ The unions contend that the picketing complied with the *Moore Dry Dock* standards and, therefore, that the district court was correct in granting summary judgment on the ground that no violation of section 158(b)(4)(B) occurred. The *Moore Dry Dock* rule, however, is only an evidentiary tool. While literal compliance with the standards set forth in *Moore Dry Dock* raises an inference that common situs picketing is primary in nature, such an inference is not conclusive and may be negated by other evidence demonstrating that the unions' true objective was to enmesh a neutral employer by inducing a work stoppage by its employees. *Allied Concrete, Inc. v. NLRB*, 607 F.2d at 830; *see* Gorman, *Labor Law* (1976) at 252. Compliance with the *Moore Dry Dock* standards, therefore, would not necessarily preclude a finding of secondary intent. *Pickens-Bond Construction Co. v. United Brotherhood of Carpenters*, 586 F.2d at 1241; *see also International Ass'n of Bridge, Etc. v. NLRB*, 598 F.2d 1154, 1157 (9th Cir. 1979); *Carpenters Dist. Council of So. Colo. v. NLRB*, 560 F.2d 1015, 1018 (10th Cir. 1977). Even when the picketing meets the *Moore Dry Dock* standards, the courts look to other factors to determine whether the object of the picketing was to involve a neutral employer in the dispute by inducing its employees to cease working. *See Gulf Coast Building & Supply Co. v. International Brotherhood of Electrical Workers*, 428 F.2d 121, 125 (5th Cir.), *cert. denied*, 400 U.S. 942, 91 S.Ct. 240, 27 L.Ed.2d 246 (1970); Gorman, *Labor Law* (1976) at 252.

■ Sherman Oaks will have a more difficult time establishing improper motive and intent because it did not attempt to restrict the location of the picketing by establishing a reserve gate system to insulate employees of neutral subcontractors from involvement with the pickets. The unions did not violate a properly established reserve gate system in an attempt to influence neutral employees. *See Allied Concrete, Inc. v. NLRB*, 607 F.2d at 831. Since no restriction on the location of the picketing was imposed, the unions could properly picket those areas on the jobsite where primary and neutral employees were working, as long as the object of such picketing was not to induce neutral employees to engage in a work stoppage.

■ In granting summary judgment for the unions, the district court necessarily concluded that there were no material issues of fact concerning the legality of the unions' objectives in picketing the jobsite. This conclusion was incorrect. In common situs picketing, a union has "a heavy burden . . . to convince the trier of fact that the picketing was conducted in a manner least likely to encourage secondary effects." *Allied Concrete v. NLRB*, 607 F.2d at 830, *quoting International Ass'n of Bridge, Etc. v. NLRB*, 598 F.2d at 1159 (9th Cir. 1979). In support of their motion for summary judgment on Count One, the unions attached only the declaration of Joe Bencivenga, the Carpenters' business representative. The declaration, which states only that Bencivenga had no contact with any employees of the neutral subcontractors, did not dispute the vast majority of factual allegations contained in Count One of Sherman Oaks's complaint. This document, thus, did not establish the absence of a genuine issue of fact as to the object of the unions' activities.

■ Furthermore, in opposition to the unions' motion, Sherman Oaks submitted affidavits and depositions, which raised genuine issues of material fact as to the intent of Carpenters Union in picketing the jobsite and as to the degree and nature of involvement of the other defendant unions. The materials submitted by Sherman Oaks provided evidence that representatives of

the Carpenters Union, as well as the business agents of the other unions, were encouraging employees of neutral subcontractors not to come to work. The evidence indicated that neutral employees were informed that the picket line was "sanctioned" by the Los Angeles County Building and Construction Trades Council. Sherman Oaks contends that the word "sanctioned" is a code word indicating to neutral employees that they should refuse to cross the picket line. Moreover, the picketing on January 11–14, when Arvizu was not present on the jobsite, and the use of the "JOB UNSAFE" signs provide some evidence that the unions may have been attempting to coerce employees of the neutral subcontractors to cease working at the jobsite. There was sufficient evidence submitted by Sherman Oaks to raise a genuine issue of fact as to whether the unions intended to enmesh neutral employers in the dispute with Arvizu by encouraging their employees to engage in a work stoppage.

Even when the evidentiary facts are undisputed, summary judgment should not be granted where contradictory inferences may be drawn from those facts. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *United States v. Perry*, 431 F.2d 1020, 1022 (9th Cir. 1970). Nor is summary judgment generally appropriate in cases such as this one, where motive and intent play a leading role in a determination of liability, and where the proof is largely in the hands of the defendants. *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962).

In granting summary judgment, the district court concluded that the unions did not intend to engage in conduct violative of section 158(b)(4)(B). This was the ultimate issue to be resolved in the case and required a resolution of disputed facts and inferences concerning the actions taken by each union. Resolution of this issue also necessarily depended upon credibility determinations. It is not the trial court's function on a motion for summary judgment to resolve genuine issues of fact, including credibility of witnesses. *Securities & Exchange Com'n v. Koracorp Industries*, 575 F.2d 692, 698 (9th Cir.), *cert. denied*, 439 U.S. 953, 99 S.Ct. 348, 58 L.Ed.2d 343 (1978). Because there are genuine issues of material fact to be resolved, we REVERSE the judgment of the district court and REMAND the case for further proceedings, consistent with this opinion.

REVERSED AND REMANDED.